COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Petty, O'Brien and AtLee
Argued at Lexington, Virginia


KAREN ELAINE BRYANT

                                                       MEMORANDUM OPINION[*] BY
v.        Record No. 1550-14-3                 JUDGE RICHARD Y. ATLEE, JR.
                                                             MAY 10, 2016
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ALLEGHANY COUNTY
Humes J. Franklin, Jr., Judge

Neill Wente for appellant.

Victoria Johnson, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


Following a bench trial, a judge of the Circuit Court of Alleghany County ("trial court")

convicted appellant Karen Elaine Bryant of making a false report to law enforcement. Appellant

assigns the following errors: (1) the trial court erred in overruling her motion to strike because

the evidence was insufficient to establish she made a false report to a police officer as to the

commission of an offense; and (2) the trial court erred in overruling her objection to evidence of

previous reports of sexual assault to police officers.[1]

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Appellant presents an additional assignment of error in her opening brief that she did
not include in her petition for appeal, in which she argues that the trial court erred "by allowing
the Commonwealth to admit into evidence photographs of text messages that were alleged to
have been sent by the appellant to Dennis Brown, without requiring the Commonwealth to lay
the proper foundation." Under Rule 5A:12(c)(1)(i), "[o]nly assignments of error assigned in the
petition for appeal will be noticed by this Court." Because the "Court of Appeals can only
consider issues properly brought before it by the litigants," Commonwealth v. Brown, 279 Va.
235, 241, 687 S.E.2d 742, 745 (2010), such an omission precludes our considering this
assignment of error.

## I. BACKGROUND

On February 18, 2013, appellant went to the Clifton Forge Police Department to report a rape. The officer instructed her to go to the hospital. She went to the hospital and reported that she had been raped. Because ten days had passed since the alleged rape, medical personnel did not perform a physical evidence recovery kit test. Medical examination detected no injuries or physical evidence of sexual assault.

An investigator with the Alleghany County Sheriff's Office, Lieutenant R.C. Fridley, met appellant at the hospital. She told him about two instances of sexual assault by D. Brown, "a friend or ex-boyfriend." Appellant reported that on February 8, 2013, after she dropped her ex-husband[2] off at a grocery store, she met Brown at a gas station and followed him to his home because he owed her some money. She said that:

> once they arrived at the residence they had set [sic] down to talk for a few minutes. He got up and walked past her to the bedroom and then he called her into the bedroom. Once she arrived into the bedroom, she said Mr. Brown had began [sic] taking her shirt off and she had said no. And then the next thing she knew was her words her ["]pants were coming off and he was inside of["] her.

After the rape, appellant told Lieutenant Fridley that Brown "had gone into the living room to have a cigarette and at that point she followed him in. They sat and talked for a while and then she left the residence." Appellant went on to say that because Brown did not pay her on the 8th, she went back on the night of the 14th. On that occasion, "she said Mr. Brown approached her and stuck his penis in her mouth and grabbed her hair toward the back of her head and just kept moving her head back and forth until he ejaculated in her mouth and on her hair." After that "they talked for just a little bit, discussed going to Gander Mountain on Sunday and then she

---

[2] The relationship between appellant and her ex-husband is best characterized, to borrow from popular social media parlance, as "it's complicated." It is not clear if they were legally divorced at this time; however, they lived together despite no longer behaving as husband and wife.

- 2 -

left." Lieutenant Fridley asked her to write a statement, and bring the statement and her cell phone with her to the police station.

Lieutenant Fridley went directly to Brown's residence. He advised Brown of the complaint. Brown spoke with Lieutenant Fridley and offered to let the Lieutenant look at his cell phone. Lieutenant Fridley found a text message exchange with a number independently confirmed to be appellant's. The text messages started on February 14, 2013, and continued through February 17, 2013 (the day before appellant reported the rape). The text messages included the following messages from appellant to Brown[3]:

- "Good morning. I enjoyed our talk last nite. I want 2 go out with u 2nite. Sorry no more floor. Im 2 sore from the floor. I love u" (Feb. 14, 2013).
- "I would like 2 spend time with u like last nite. It was great! Love u" (Feb. 15, 2013).
- "I really enjoyed u last nite" (Feb. 15, 2013).
- "I want lots more time with u like last nite" (Feb. 15, 2013).
- "Can we go 2 roanoke sunday please" (Feb. 15, 2013).
- "Honey u there? I miss u 2nite so bad" (Feb. 15, 2013).
- "Im here not going 2 leave u" (Feb. 15, 2013).
- "Do u miss me" (Feb. 15, 2013) (to which Brown replied: "Yea karen").

The subsequent messages documented escalating tensions and the deterioration of appellant's and Brown's relationship.[4]

After Lieutenant Fridley unsuccessfully reached out to appellant "a couple of times" they met again on March 19, 2013. During the meeting, he asked for appellant's cell phone number,

---

[3] For all quoted text messages throughout this opinion, we spare the reader from what would prove to be a distracting number of "sic"s or alterations, and instead retain the original spelling and grammar.

[4] Specifically, appellant repeatedly took offense at Brown's failure to respond as quickly as she wished, and at one point expressed irritation that Brown was seeing a friend instead of spending time with her. She revealed that she told her ex-husband "how good u were when we did n past" to which Brown expressed concern that she was bringing him into her marital problems (Brown: "He likes to start trouble"; Appellant: "I think he has had enough jail. He dont want any more jail time"). The conversation devolved further (Brown: "Im tellen u if u playen games again im not doing it"), with the last messages exchanged on February 17th. Appellant reported the rapes the following day.

which she provided, although she claimed not to have her phone with her. The number provided matched the number from the text messages identified by Brown. Lieutenant Fridley asked her to recount the assaults so he could audio-record her statement. Appellant said that she and Brown had been texting about going out to dinner since February 5th, and when she met him on the 8th, she expected to go to dinner. Instead, they went to Brown's house, where he raped her. Afterwards, he smoked a cigarette in the living room and she went in to talk to him. She estimated she stayed and talked for "less than two hours." As to the second assault, she said that on February 14, 2013, she went to Brown's home expecting to receive a Valentine's Day gift. She said that Brown's home had no furniture except for a chair and a bed and that he made her perform oral sex while sitting on the floor. After the assault, she stayed for about thirty minutes, and discussed going to Gander Mountain.

Appellant never provided her phone to Lieutenant Fridley. The defense introduced the first and only record of its text message contents at trial. It revealed numerous texts with "DCB," whom appellant identified as Brown. The messages went as far back as December 2012. Her text exchange contained the same final message as Brown's, sent by Brown to appellant on February 17, 2013: "Why u get mad did u get mad u dont text bk ill have my number changed." Numerous messages, including every message exchanged on February 14th and 15th, had been deleted.

At trial, appellant testified that she went to Brown's house on both occasions to collect money he owed her. When confronted on cross-examination, she denied that she went expecting to go to dinner or to receive a Valentine's Day present, and disclaimed any memory of having previously told this to Lieutenant Fridley. She denied sending any of the text messages recovered from Brown's phone, and stalwartly maintained that any discrepancies were due to someone else sending or deleting the messages.

## II. ADMISSIBILITY OF PRIOR REPORTS OF SEXUAL ASSAULT

"It is well settled that '[t]he admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion.'" Wood v. Commonwealth, 57 Va. App. 286, 304, 701 S.E.2d 810, 818 (2010) (quoting James v. Commonwealth, 18 Va. App. 746, 753, 446 S.E.2d 900, 904 (1994)).

Appellant challenges evidence introduced through three witnesses. First, Lieutenant Fridley testified that, during the course of his investigation into the allegations against Brown, he asked appellant if she had previously been abused or sexually assaulted. During their first meeting at the hospital, she told him her uncle had raped her when she was six years old. At their second meeting a month later, she said she had an abusive husband, J.P., who had threatened to kill her. She added that she "was raped again at the age of thirteen (13) for two (2) years on Mondays by her dad's friend." She denied any sexual or domestic abuse by her ex-husband.

Two other witnesses testified at trial about appellant's previous reports of rape and sexual assault. Beth McFarland testified that, during the course of her duties as an investigator with the Botetourt County Sheriff's Office, she investigated numerous instances where appellant had reported sexual assault, including:

(1) April 2000: rape by P.F.
(2) October 2007: three rapes in April 2006 by D.S.
(3) October 2009: rape by her ex-husband
(4) August 2010: her ex-husband "threatened to rape her and that she was woken up every morning since June or July 2010 with his finger insider her vagina"
(5) August 2010: rape by her ex-husband

Lieutenant Ronald Paxton of the Clifton Forge Police Department testified that, based on appellant's October 2007 reports, they brought charges for three counts of rape against D.S., but the grand jury did not indict.

Assuming without deciding that appellant properly preserved the objection to this evidence as prejudicial or improper character evidence,[5] the trial court did not abuse its discretion in permitting this testimony. These previous reports speak to appellant's intent to mislead, a key element of making a false report to law enforcement. See Code § 18.2-461. The fact that appellant previously reported rapes to various law enforcement offices, even testifying before a grand jury in one instance, speaks to her understanding of the repercussions of reporting rape or sexual assault, and why she may have done so in retribution after her relationship with Brown soured.

In addition, these prior reports show significant discrepancies between her reports to the Botetourt Sheriff's Office and her statements to Lieutenant Fridley. Despite having multiple opportunities to disclose these alleged prior sexual assaults during the course of this investigation, she never mentioned rapes by D.S. or P.F. to Lieutenant Fridley. She expressly denied any history of sexual abuse or rape by her ex-husband. A defendant's truthfulness is crucial to discerning her intent when making a report, and appellant's inconsistencies call her truthfulness into question. Accordingly, the trial court did not abuse its substantial discretion when it admitted evidence of appellant's prior reports.

### III. SUFFICIENCY OF THE EVIDENCE

Appellant argues that the evidence presented at trial was insufficient to show she possessed the requisite intent to mislead. We disagree.

"Whether the evidence adduced is sufficient . . . is a factual finding, which will not be set aside on appeal unless it is plainly wrong." Collins v. Commonwealth, 65 Va. App. 37, 48-49,

---

[5] See Irving v. Commonwealth, 15 Va. App. 178, 179, 422 S.E.2d 471, 473 (1992) (*en banc*) (holding, with a divided Court, that appellant did not state in the trial court his reason for objection with the specificity required by Rule 5A:18 when objected to relevance and not that the evidence was overly prejudicial).

773 S.E.2d 618, 624 (2015) (quoting Lawlor v. Commonwealth, 285 Va. 187, 223-24, 738 S.E.2d 847, 868 (2013)). "In reviewing that factual finding, we consider the evidence in the light most favorable to the Commonwealth and give it the benefit of all reasonable inferences fairly deducible therefrom." Id. at 49, 773 S.E.2d at 624 (quoting Lawlor, 285 Va. at 224, 738 S.E.2d at 868).

Under Code § 18.2-461, it is "unlawful for any person (i) to knowingly give a false report as to the commission of any crime to any law-enforcement official with intent to mislead." The Commonwealth may prove intent through an accused's acts or statements. Wilson v. Commonwealth, 249 Va. 95, 101, 452 S.E.2d 669, 673-74 (1995). Proof of intent generally derives from circumstantial evidence. See McEachern v. Commonwealth, 52 Va. App. 679, 684, 667 S.E.2d 343, 345 (2008) ("To be sure, 'there is not one case in a hundred where the felonious intent in the original taking can be proved by direct evidence.'" (quoting Skeeter v. Commonwealth, 217 Va. 722, 726, 232 S.E.2d 756, 759 (1977))). Intent to provide a false report "may be inferred from the conduct of the accused if such intent flows naturally from the conduct proven." Wilson, 249 Va. at 95, 452 S.E.2d at 674.

The text messages from Brown's phone, deleted from appellant's phone, present damning evidence that appellant intended to deceive law enforcement. The day of the second alleged rape (less than a week after the first one), she texted Brown "I enjoyed our talk last nite. I want 2 go out with u 2nite. Sorry no more floor. Im 2 sore from the floor. I love u." The day after, she sent Brown numerous messages effusing her affection for him and her zest for whatever transpired between them the previous night. Brown's text messages reveal that he and appellant actively texted back and forth, with appellant even becoming agitated when Brown did not respond quickly enough. The messages reveal increasing conflict leading up to February 17th, when appellant apparently chose to dole out the colloquial "silent treatment" and stopped

responding to Brown's messages. The following day, she went to report the rapes to law enforcement.

Furthermore, on at least five previous occasions, appellant reported rapes to law enforcement, indicating she knew the ramifications of doing so. She was plainly aware that her report could have led to charges against Brown, particularly given that one of her prior reports led to a grand jury inquiry into her allegations. Viewed within the totality of the circumstances, her prior reports speak to her awareness that she was making a false report against Brown, and the vengeful impact of such a report.

The primary counterweight to the evidence of appellant's fraudulent intent is her own testimony, which did little to enhance her credibility. Although, as an appellate court, we cannot directly observe her demeanor on the stand, the trial transcript plainly reveals that appellant was an obstinate and incredible witness. When directly confronted with the substantial inconsistencies between her testimony and the evidence, she was resolute in her lies and refusal to acknowledge those inconsistencies.[6] A trial court is entitled, based on its direct observation of a witness' demeanor, to assess her credibility. It is readily apparent why the trial court judge would have disbelieved appellant's testimony.

The evidence of appellant's guilt is overwhelming. The trial judge went so far as to state that "[t]his is incredible to me. Just absolutely incredible. I've never seen a more overwhelming

---

[6] To provide some examples: when asked about the numerous discrepancies between appellant's testimony and her previous audio-recorded report to Lieutenant Fridley regarding her reasons for meeting Brown, appellant responded, "I don't remember telling him that." When an increasingly frustrated prosecutor asked about appellant's report that she "[s]tayed and talked with [Brown] some time less than two (2) hours you stayed, you told Detective Fridley, right? Right? Is that what you told Detective Fridley?" appellant testified, "I don't know how long it was. I did not have a watch on me." When asked about the text messages deleted from her phone, appellant's answers ranged from "Somehow or another it got deleted" to "I don't know [why they are not there]. I don't walk around with my cell phone on my hip all the time."

beyond a reasonable doubt case." We cannot say the trial court was plainly wrong in finding the evidence of appellant's guilt sufficient.

## III. Conclusion

For the stated reasons, we find no error and affirm.

<u>Affirmed.</u>